# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SYLVAIN A. MAGGARD, ETC.,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:12CV00031 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **ESSAR GLOBAL LIMITED, ET AL.,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*John R. Owen, Julie S. Palmer, and Lester C. Brock, III, Harman, Claytor, Corrigan & Wellman, Richmond, Virginia, for Plaintiff; James F. Neale, Meghan Cloud, and Kristin A. Davis, McGuireWoods LLP, Charlottesville, Virginia, for Defendants.*

The plaintiff, Sylvain A. Maggard, has sued the defendants, an international conglomerate and its related entities (herein collectively called "Essar") for a finder's fee that he claims is owed him following the $600 million acquisition by Essar of a coal mining company, Trinity Coal Corporation ("Trinity Coal").  Essar agreed that it hired Maggard, but contends that it was only as a consultant.  It paid him a monthly salary and expenses and concedes that he was a "valued and valuable member of Essar's deal team, [who] devoted considerable time and energy to a substantial due-diligence effort."  (Defs.' Reply Supp. Mot. Summ. J. 19.)  Nevertheless, Essar contends that it has paid Maggard all that it owes him and

denies that it agreed to pay him a finder's fee. Maggard seeks judgment for "no less than" $8.6 million. (Am. Compl. ¶ 75.)

Following discovery in the case, Essar has filed a Motion for Summary Judgment. It contends that judgment should be entered in its favor because (1) the uncontested facts show that Maggard was not the source of the Trinity Coal opportunity; (2) the oral contract for a finder's fee alleged by Maggard is barred under the New York statute of frauds; and (3) Maggard's alternative claim for quantum meruit recovery fails as a matter of law.

Essar's Motion for Summary Judgment has been briefed and orally argued and is ripe for decision. For the reasons that follow, I will deny the motion.

## I. Factual BACKGROUND.

The following facts taken from the summary judgment record are either undisputed, or where disputed, are stated in the light most favorable to the plaintiff.

In 2008, Essar developed an interest in acquiring a source of metallurgical coal for use in its Essar Steel Algoma, Inc. ("Algoma") operations. UBS Investment Bank ("UBS"), "[a]s part of a decade-long relationship," began to advise Essar on potential acquisitions for Algoma's supply of metallurgical coal. (Mem. Supp. Defs.' Mot. Summ. J. 14.) UBS employee Dan Chu, who had recently assisted Denham Capital, the owner of Trinity Coal, in an unsuccessful

initial public offering of Trinity Coal, listed the coal mining company as a "Strategic Coal Opportunit[y]" in a September 2008 presentation to Essar executives. (*Id.* Ex. E.) UBS again discussed Trinity Coal in presentations to Essar in January and June 2009, and "[a]round and among these three presentations, Mr. Chu met with Essar in London, New York, and Toronto; with Trinity Coal in Scott Depot, West Virginia; and with Denham Capital in Boston and Houston to further discuss the opportunity," all before Maggard was hired by Essar. (Mem. Supp. Defs.' Mot. Summ. J. 15.)

In an April 7, 2009, internal email, Essar executive Rajiv Saxena attached "the consolidated list of metallurgical coal opportunities received / being considered by Essar . . . ." (*Id.* Ex. G.) Trinity Coal was listed among several other potential companies, and Essar intended to "get back to UBS if interested . . . ." (*Id.*) At that time, however, Essar was "seriously considering acquisition" of Grande Cache Coal Corporation, a Canadian coal mining company. (*Id.*) By June 2009, an Essar internal document reported three potential acquisitions — Grand Cache Coal Corporation, Imagin Natural Resources, and Alloy Mine — but noted that the company was "[i]dentifying other potential targets through local brokers in mining regions in [the] U.S." (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. Ex. 4.) To that end, Essar had published a classified advertisement seeking a "Senior Mining Consultant" in newspapers in Charleston, West Virginia, and

Pittsburgh, Pennsylvania, and on coal-related websites. The advertisement specified, among other things, that qualified candidates "[m]ust be familiar with North American and in particular Central Appalachian coals," and that a "[r]esident in Central Appalachia is preferred." (*Id.* Ex. 5.) It indicated that "[t]he successful candidate will consult with senior members of the corporate team regarding formulating the right strategy for coal mining resource options in North America." (*Id.*) On June 12, 2009, Maggard emailed the following response to the advertisement:

> I have high level contacts within every coal company in the U.S. . . . I have a large portfolio of coal properties and reserves available for purchase or lease. . . . If you do not consider me for the position, feel free to contact me for property visits. You will not find these properties for sale on any public forum.

(*Id.* Ex. 6.) On June 21, 2009, Madhu Vuppuluri, an Essar executive in New York, telephoned Maggard at his home in Pound, Virginia. According to Maggard, in this conversation, he proposed for his services $750 per day, an additional $500 for any overnight travel, reimbursement of expenses, and a three percent commission "for any opportunity that [he] presented that led to an investment." (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 8.) Vuppuluri responded, "Fair enough, when can you come to New York to meet with [Essar founder] Ravi Ruia[?]" (Mem. Supp. Defs.' Mot. Summ. J. Ex. I at 497:3-4.) That same month, Maggard did travel to Essar's New York office to deliver an informational presentation on coal and a

description of the properties in his portfolio.[1]  After the presentation, Vuppuluri informed Maggard that Ruia wanted to make a larger investment than originally contemplated and requested a revision of the commission arrangement.  Maggard subsequently agreed to a "3-2-1" structured commission, wherein he would receive three percent of the first $100 million of any investment, two percent of the second $100 million, and one percent of any amount in excess of $200 million.  (*Id.* at 187:3.)

After this initial meeting, Maggard began arranging mine visits and communicating with executives at coal mining companies in several different states.  On July 23, 2009, Maggard emailed Karan Ahluwalia, an Essar Steel Minnesota associate, and stated, "I can talk to Ben Hatfield at ICG, Ken Woodring [President and Chief Executive Officer] at Trinity, Gary Cox at Premier Elkhorn and set up appointments at your request."  (Mem. Opp'n Defs.' Mot. Summ. J. Ex. 20.)  Maggard then arranged the first site visit to Trinity Coal's West Virginia metallurgical mines and the first meeting between Essar and Trinity Coal executives on July 29.

---

[1]  The parties agree that, during this first meeting, Maggard discussed Sigmon Coal, Premier Elkhorn, Tennessee Consolidated Coal, and Hatmaker.  However, they dispute whether Trinity Coal was discussed.  While there is no record of its presentation, Maggard claims that he explained his contacts with Trinity Coal and listed it with a "Sharpie" on a "[p]ost-it board."  (*Id.* at 483:16-19.)

By early August 2009, Maggard had obtained the execution of a non-disclosure agreement between Trinity Coal and Essar, facilitating the exchange of information in the acquisition negotiations. In an August 6 email to Maggard, Woodring proposed an itinerary for additional site visits between August 15 and August 25, and indicated that Trinity Coal was "pleased to hear Essar is interested in looking further at [its] metallurgical properties." (*Id.* Ex. 25.)

On August 17, Maggard indicated that "[t]here are three people besides Essar at the table" with Trinity Coal; he expressed concern that Essar's failure to visit per the itinerary "would be considered [a] lack of interest," and he requested "an Essar representative to satisfy their agenda." (*Id.* Ex. 29.) On August 18, Ahluwalia, Vuppuluri, and Maggard traveled to Trinity Coal's office in Scott Depot, West Virginia and "[three] structures [were] broadly discussed [with Trinity Coal executives] for potential transaction with Essar." (*Id.* Ex. 30.) On August 19, Maggard emailed Essar executives after speaking with Woodring and notified them that the "[s]tructure between Essar and Trinity was discussed with Den ham [sic] today. Ken does not foresee a problem with structure details. But does think it may be Friday before they have details [sic] structure to forward to Essar." (*Id.* Ex. 31.) On Friday, August 21, Woodring emailed Maggard and Essar executives to confirm that Trinity Coal executives "spent a couple of hours on the phone with the Denham folks to bring them up to speed with our thinking . . . . and we will

deliver the conceptual proposal to [Essar] early next week." (*Id.* Ex 32.) No one from UBS was included in these emails. In fact, Chu and UBS were later retained by Denham Capital, not Essar, in finalizing the acquisition.

Although Maggard had been working for Essar for several months, a written employment agreement had not been executed, raising concerns among some Essar executives, including Narasimha Ramakrishnan, the Director of Finance at Essar Steel Minnesota, that he might be considered an employee rather than an independent contractor. In September 2009, because he was working more than originally anticipated, Maggard renegotiated his compensation to $4,000 per month, and on September 17, Ahluwalia requested from Ramakrishnan an emergency transfer of funds to Maggard, assuring Ramakrishnan that he would "ensure all the paper work is complete once [he is] back in NY." (*Id.* Ex. 48.) On October 2, Ramakrishnan forwarded a copy of Essar's form contract for independent contractors to Ahluwalia, and remarked, "Let the compensation be mentioned as $4,000 per month. Do not specify the hours." (*Id.* Ex 44.) Confirming the new arrangement, Vuppuluri wrote the following in a November 17, 2009 correspondence to Maggard:

> You will be paid at the end of each month a rate of $4,000.00. In addition to this monthly fee, Essar Steel Minnesota will reimburse you for <u>all of your out-of-pocket expenses, including food, accommodations, travel, cell phone, gas and mileage (according to IRS Standard Mileage rate.)</u>

. . . .

> At your earliest convenience, please respond that you agree to these terms.

(*Id.* Ex 47.) (emphasis in original). According to Maggard, Vuppuluri orally explained that the engagement letter served as a necessary legality to continue receiving "Part A of [his] compensation agreement," but Vuppuluri assured him that this did not affect his "Part B" commission arrangement. (*Id.* Ex. 1 at 344:5-17.)

On November 30, 2009, Ahluwalia emailed Maggard the independent contractor agreement, and wrote, "Give me a call later so that we can go through and amend as required per your job duties/compensation. Once we amend, we can execute after I show to Madhu [Vuppuluri]." (*Id.* Ex. 38.) Maggard replied on December 4, 2009, with a revised version of the agreement containing his proposed changes. He substituted the following language in place of the draft compensation section: [2]

---

[2] According to Maggard, he and Ahluwalia engaged in line-by-line review and revision of the draft contractor agreement, and because Ahulwalia was not present for the revision of the commission agreement from a flat three percent to the "3-2-1" arrangement "[he] instructed [Maggard] to leave [the commission percentage] blank, and he said, when Madhu gets here, then if he has any questions, we'll call, and we can insert it later." (*Id.* Ex. 1 at 201:10-13; 432:13-17.) Ahluwalia does admit that he was at least aware of a discussion of a commission. (*Id.* Ex. 3 at 15:12-14 ("So I am aware what Sylvain, I think, initially had sent, which I recall probably had a 3 percent figure in that. That's the extent of it.").)

> In consideration for investments or cooperation opportunities brought to or made knowledge of, Essar Americas and all associated entities by Sylvain Maggard ("OMG"). [sic] That lead to an investment, association, cooperation, jv venture, or any other form of financial productive business organization that is signed by a binding agreement. EA will furnish a bonus fee to Sylvain A. Maggard ("OMG") in line with industry fees associated with such services. If a binding contract relating to a Transaction is signed and completed between a Client and the Company, the Company agrees to pay the Contractor ("OMG") a fee representing ___% of the total contract value as a commission for its services.

(*Id*. Ex. 39.) Maggard also amended a subsection entitled "Service to be Rendered by Contractor" to include "Helping the Company to find investment and/or cooperation opportunities; Assisting the Company in discussions and negotiations with the Clients and managing the process in respect of the same." (*Id*.) Maggard signed and backdated the agreement to June 22, 2009, but Essar never executed it. Maggard similarly signed and backdated the non-disclosure agreement, emailed to him on December 8, 2009, that Essar similarly did not execute. On January 15, 2010, Ramakrishnan emailed Ahluwalia expressing worry that Essar was "inviting avoidable [legal] trouble" in failing to define Maggard's employment relationship with Essar. (*Id*. Ex. 48.) He noted that Ahluwalia had not completed Maggard's "paper work" as promised and that the [November 17, 2009] engagement letter was "still pending." (*Id*.)

On March 20, 2010, Maggard emailed Vuppuluri to inquire about the status of his impending commission payment: "Now that our first project together is

coming to close. How and when, will my finders/bonus fee for bringing Essar to the Trinity opportunity be paid?" (*Id.* Ex. 50.) There was no response by Essar.

Essar purchased Trinity Coal from Denham Capital on April 7, 2010. Essar subsequently offered Maggard employment at Trinity Coal, with an annual salary of $65,000 plus fringe benefits, and the defendants highlight that "[h]e accepted the job without protesting the . . . breach he now alleges. He left Trinity Coal two years later, in June 2012, about four months before filing this suit." (Mem. Supp. Defs.' Mot. Summ. J. 8-9.) Maggard responds that he continually attempted to address his outstanding finder's fee and that he accepted the position so as not to "insult Ravi Ruia and sour relations with Essar before receiving his commission." (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 15.) Indeed, on June 16, 2010, Maggard wrote to Ruia again seeking resolution of his alleged commission agreement, to which he never received a reply.

## II. DISCUSSION.

Summary judgment is appropriate when there is "no genuine dispute as to any material fact," given the parties' burdens of proof at trial. Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether the moving party has shown that there is no genuine dispute of any material fact, a court must assess the factual evidence and all inferences to

be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), *overruled on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Applying these standards, the defendants' motion for summary judgment must be denied.

## A. Choice-of-Law.

In a diversity case, I must apply the conflict of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "It is a long-standing rule in Virginia that '[t]he nature, validity, and interpretation of contracts are governed by the law of the place where [the contract was] made . . . .'" *Black v. Powers*, 628 S.E.2d 546, 554 (Va. Ct. App. 2006) (quoting *C.I.T. Corp. v. Guy*, 195 S.E. 659, 661 (Va. 1938)). "The place where the last act necessary to give validity to the contract occurs is the place where the contract was made." *Pro-Football Inc. v. Paul*, 569 S.E.2d 66, 71 (Va. Ct. App. 2002) (internal quotation marks and citation omitted). Maggard contends that the contact was made in Virginia, where he assented in his telephone conversation with Vuppuluri to travel to New York to meet with Essar officials. But I find that the present record is clear, based upon Maggard's own sworn testimony, that the contract sued upon was made when Vuppuluri allegedly accepted Maggard's oral offer to provide his services in return for a finder's fee, by stating, "Fair enough." (Mem. Supp. Defs.' Mot. Summ. J. Ex. I at 497:3-4.) Vuppuluri was in New York and the contract, if

it existed, was made then and there. *See* 17A Am. Jur. 2d *Contracts* § 101 (2004) ("[A]n acceptance of an offer by telephone is effective, and the contract is created at the place where the acceptor speaks."); *Brown v. Valentine*, 240 F. Supp. 539, 540 (W.D. Va. 1965) (same).

While it is true that when "a contract is made in one jurisdiction but performed in another, the law of the place of performance governs the contract," *Hunter Innovations Co. v. Travelers Indem. Co. of Conn.*, 753 F. Supp. 2d 597, 603 (E.D. Va. 2010) (citing *Erie Ins. Exch. v. Shapiro*, 450 S.E.2d 144 (Va. 1994)), "an exception exists when the contract is to be performed more or less equally among two or more states, in which case the law of the state in which the contract was made should apply." *Tharpe v. Lawidjaja*, No. 6:12-cv-00039, 2014 WL 1268820, at *32 (W.D. Va. Mar. 26, 2014); *see also* Restatement (Second) of Conflict of Laws § 188 cmt. e. (1971) ("The place of performance can bear little weight in the choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown . . . .") The present summary judgment record does not indicate in which state the parties intended the alleged contract to be performed, and in fact, according to the plaintiff, it was partly performed in New York, Minnesota, Virginia, West Virginia, and even in India. Because the alleged oral contract was to be performed in multiple jurisdictions, and no jurisdiction

appears to have been the principal place of performance, it is governed by the law of the place where it was made — New York.

## B. Presentment of Trinity Coal.

The defendants first argue that they are entitled to summary judgment because Maggard did not satisfy the terms of his alleged commission agreement, insofar as he did not "present" the Trinity Coal opportunity to Essar. However, given the parties' differing interpretations of presentment and the evidence both parties have offered in support of their respective interpretations, I find that there is a genuine factual dispute as to whether Maggard's actions on behalf of Essar satisfied the terms of the alleged oral agreement.

"When a contract, read as a whole to determine its purpose and intent, plainly manifests the intent of the parties, relief may be granted by way of summary judgment. Where, however, the contractual provision relied upon is ambiguous, the resolution of the ambiguity is for the trier of fact." *Spano v. Kings Park Cent. Sch. Dist.*, 877 N.Y.S.2d 163, 166 (App. Div. 2009) (internal quotation marks and citations omitted). [3] There is a latent ambiguity[4] in the language of the

_____

[3] Application of the law of Virginia (the location of Maggard's office) or West Virginia (where Trinity Coal is located) concerning contractual ambiguity would not change the determination of this issue. *See, e.g.*, *Bear Brand Hosiery Co. v. Tights, Inc.*, 605 F.2d 723, 726 (4th Cir. 1979) (quoting *Am. Fid. Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965)) ("Only an unambiguous [agreement] justifie[s] summary judgment, and no writing is unambiguous if 'susceptible of two reasonable interpretations.' . . . If there is more than one permissible inference as to intent

alleged oral commission agreement. In particular, the phrase "any opportunity that Maggard presented that led to an investment" is susceptible to two reasonable interpretations proffered by the parties. (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 8.) Essar contends that this language, and the language of the subsequent, unexecuted draft contractor agreement, "required [Maggard] to be the first presenter or 'finder' of a given opportunity to be eligible for a commission. . . ." (Mem. Supp. Defs. Mot. Summ. J. 12.) Because UBS first informed Essar about Trinity Coal, the defendants reason, Maggard's claim to a commission is defeated. However, Maggard responds that "UBS never introduced the parties or started the transaction," which he contends constitutes true presentment of the opportunity. (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 2.)

Maggard made clear as early as his email responding to Essar's advertisement of the position that his value was his knowledge of potential opportunities. Furthermore, there is no indication that acquisition talks were

_____

to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact."); *Am. States Ins. Co. v. Surbaugh*, 745 S.E.2d 179, 183 (W.Va. 2013) (citation omitted) ("Only if the court makes the determination that the contract cannot be given a certain and definite legal meaning, and is therefore ambiguous, can a question of fact be submitted to the jury as to the meaning of the contract.").

[4] "A latent ambiguity which may be explained by parol evidence occurs where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or evidence aliunde creates a necessity for interpretation or a choice among two or more possible meanings." *Chem. Bank N. Y. Trust Co., Dommerich Div., v. Liebman*, 379 N.Y.S.2d 69, 77 (App. Div. 1976) (internal quotation marks and citation omitted).

underway before Maggard arranged formal introductions between Essar and Trinity executives. In fact, by June 2009, immediately before Maggard was hired, it appears as if Essar had eliminated Trinity from its previous list of potential acquisitions and narrowed the prospects to Grande Cache Coal Corporation, Imagin Natural Resources, and Alloy Mine.

It is certainly true that UBS was first in time to alert Essar to Trinity Coal as a potential acquisition, and the defendants make much of the fact that Maggard had no contact with Trinity Coal's owner Denham Capital. However, executives at Trinity Coal like Woodring appear to have been intimately involved in the acquisition and communicated regularly with Maggard in that regard. In addition, David Riggan, the former Senior Vice President and Chief Financial Officer at Trinity Coal, confirms in a declaration filed in opposition to summary judgment that

> [t]he first contact that Trinity Coal had with any Essar representative or entity regarding a potential acquisition was through Sylvain A. Maggard ("Maggard"). Maggard served as Essar's representative to initiate discussions with Trinity regarding potential business relationships and/or the sale of Trinity to Essar, and Mr. Maggard remained engaged as Essar's representative and team member throughout the acquisition process (negotiations, due diligence, and information exchanges through closing of the sale to Essar). . . .

> . . . .

> Essar's introduction to Trinity Coal was not through either UBS or Dan Chu.

(*Id*. Ex 19.)  While it is undisputed that the potential acquisition of Trinity Coal was first mentioned by UBS, the question of whether the *actual opportunity* was made available by UBS or by Maggard is more difficult to answer.  The intention of the parties as to what constituted presentment under the alleged commission agreement and whether Maggard performed in satisfaction of that agreement simply cannot be determined based upon the conflicting evidence now before the court.

## C. Statute of Frauds.

The defendants contend that the New York statute of frauds bars Maggard's action.  That statute, in relevant part, provides as follows:

> a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> . . . .
>
> 10.   Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman.

N.Y. Gen. Oblig. Law § 5-701(a)(10). Virginia has no similar provision in its statute of frauds. Maggard contends that the New York statute does not apply.

As previously discussed, New York law governs with respect to the nature, validity, and interpretation of the alleged finder's fee contract. Nevertheless, because choice-of-law doctrine directs only the application of the contracting state's substantive law, and not its procedural rules, *Frye v. Commonwealth*, 345 S.E.2d 267, 272-73 (Va. 1986), the rule of *lex loci contractus* may not always result in the application of the foreign statute of frauds. The question becomes whether the particular statute of frauds causes the oral contract to be void (substantive) or merely unenforceable in the courts of that state (procedural). *See Brown*, 240 F. Supp. at 541 (finding that New Jersey statute of frauds was not applicable to bar oral contract made in New Jersey for sale of goods valued over $500, otherwise enforceable in the forum state, because the New Jersey statute made such oral contracts only unenforceable and not void and thus was merely procedural).[5]

---

[5] There are other exceptions to *lex loci contractus*, including where a contrary intent of the parties can be determined. For example, if the contact was made in one state, "but, at the time of execution, the parties intend[ed] for the contract to be fully performed in another, specific jurisdiction, the law of the place of performance will be applied rather than the law of the place where the contract was formally executed." *Black*, 628 S.E.2d at 556. No such intent is apparent in this case. While it was likely understood that Maggard would assist Essar in relation to coal acquisitions located in the geographical region known as the Central Appalachians, there is no evidence that a specific state was contemplated. Moreover, in the performance of his duties, Maggard was required to travel to various places outside that region, including India.

This distinction derives from the 19th century English case of *Leroux v. Brown*, (1852) 138 Eng. Rep. 1119, which held that an oral contract made in France and valid there was barred under the English statute of frauds, which the court characterized as remedial. It has long been criticized, *see* Ernest G. Lorenzen, *The Statute of Frauds and the Conflict of Laws*, 32 Yale L.J. 311, 329-30 (1923), and some courts, particularly those that have adopted the approach of the Second Restatement of Conflict of Laws, have used a broader analysis. *See, e.g., Buskin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 671 (Mass. 1985) (applying "interest analysis" test as between forum state and contracting state and where interests are nearly balanced, choosing statute of frauds that would "validate the agreement, if indeed there was an agreement").[6]

The Virginia Supreme Court has not expressly adopted a choice-of-law analysis for the statute of frauds and thus in order to apply Virginia law, I must predict how it would decide the issue. To do so, I may consider among other

---

A court may also refuse to enforce a foreign rule of law that is against the forum's public policy, but there is no indication that New York's particular statute affronts Virginia public policy, since Virginia's own statute affects various types of oral contracts. *See* Va. Code Ann. §§ 11-1, 11-2, 11-2.01 (2011).

[6] The First Restatement embraced the traditional substantive-procedural test. *See* Restatement (First) of Conflict of Laws § 334 cmt. b. (1934) ("If . . . the statute of frauds of the place of contracting is interpreted as making satisfaction of the statute essential to the binding character of the promise, no action can be maintained on an oral promise there made in that or any state.")

things, "recent pronouncements of general rules or policies by the state's highest court." *Wells v. Liddy,* 186 F.3d 505, 528 (4th Cir. 1999). Because the Virginia Supreme Court has declined to adopt the Second Restatement's "most significant relationship" test when deciding similar choice-of-law issues in tort cases because it would "creat[e] uncertainty and confusion in application of [Virginia's choice-of-law] theory," *McMillan v. McMillan*, 253 S.E.2d 662, 664 (Va. 1979), and in view of its continued recognition of the general principle of *lex loci contractus,* I believe that it would adhere to the traditional substantive-procedural distinction in determining whether to apply the contracting state's statute of frauds.[7]

The New York statute of frauds clearly implicates the oral contract here and the parties' dispute is over whether the New York law is substantive or procedural — that is, whether it voids an oral contract within its purview, or merely makes it unenforceable in the New York courts.[8] One difficulty in deciding this question is

---

[7] The Virginia Supreme Court has more recently affirmed its rejection of the Second Restatement's choice-of-law doctrine in tort cases. *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006).

[8] Virginia's statute of frauds is held to be procedural, *T. . . v. T. . .*, 224 S.E.2d 148, 151 (Va. 1976) ("The [Virginia] statute [of frauds] is procedural or remedial in nature, and is concerned, not with the validity of the contract, but with its enforceability."), but Maggard does not argue that because Virginia's law is deemed remedial, it ought for that reason alone apply over a substantive New York law. If the foreign law is substantive and voids the contract then there is nothing to enforce in the forum state, even if the forum's statute is procedural and only goes to the remedy. If the foreign law does *not* void the contract, the contract still may be unenforceable under the forum's remedial statute. *See Stein v. Pulaski Furniture Corp.,* 217 F. Supp. 587, 590-91 (W.D. Va. 1963) (holding that Virginia's statute of frauds applied to bar an action on an

that the New York courts have now rejected the substantive or procedural test in determining the application of the proper statute of frauds in place of an analysis that will determine in a particular case the statute of the state that "has the paramount interest in the application of its law." *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 581 (N.Y. 1969). Accordingly, characterizing the statute of frauds as procedural or substantive "does little more than restate the problem and has even less relevance to [New York's] modern approach." *Id.*

It is certainly correct, as pointed out by the defendants, that the New York statute itself provides that the various oral contracts described are "void" and not merely voidable, which may be an indication that the statute is substantive. Nevertheless, it appears clear that New York courts have routinely construed the statute, notwithstanding its use of the word "void," as procedural. *See, e.g., Rubin v. Irving Trust Co.*, 113 N.E.2d 424, 430 (N.Y. 1953) ("[T]his court has time and again spoken of Statutes of Frauds which declare contracts 'void' as enunciating a rule of evidence or establishing a mode of proof."); *Eurofactors Int'l, Inc. v. Jacobowitz*, 800 N.Y.S.2d 569, 571 (App. Div. 2005) ("An oral agreement which falls within the statute of frauds is not absolutely invalid, but is only voidable."); *Raoul v. Olde Village Hall, Inc.,* 430 N.Y.S.2d 214, 220 (App. Div. 1980)

---

oral contract not to be performed within a year, made in North Carolina, under the law of which it would be valid and enforceable, where the Virginia statute was procedural). That was the same type of conflict that arose in the seminal case of *Leroux v. Brown*.

("[D]espite the express wording . . . that such oral contracts are 'void', the courts of this State have construed the statute to be merely a rule of evidence which, like the construction of the English statute, bars only the remedy and does not make the contract absolutely void." (internal citation omitted)); *Livoti v. Elston*, 384 N.Y.S.2d 484, 485 (App. Div. 1976) ("The oral contract . . . was not void since it is the settled New York rule that our Statute of Frauds . . . makes oral agreements not void but unenforcible [sic]." (alternation, internal quotation marks and citation omitted)).[9]

In support of their position, the defendants cite cases by this circuit and others that have applied the New York statute of frauds in other forums under the *lex loci contractus* principle. But I do not find any of these cases binding or persuasive precedent. For example, in *Hardy-Latham v. Wellons*, 415 F.2d 674 (4th Cir. 1968), the only Fourth Circuit case relied upon, a brokerage contract made in New York had been sued upon in federal court in North Carolina. On appeal, the court noted sua sponte[10] that the New York statute of frauds would have applied to bar the action but since it had not been pleaded, the court would

---

[9] These cases do not involve section 5-701(a)(10) relating to finders' fees, but they nevertheless construe the word "void" either as it refers to other types of oral contracts set forth in the statute or in another statute covering oral contracts relating to real estate, N.Y. Gen. Oblig. Law § 5-703(2). There is no principled difference in the interpretation of these different aspects of the statutes.

[10] "Although the matter has not been briefed by counsel, independent study satisfies us . . . ." *Id.* at 677 (footnote omitted).

reach the merits of the case. *Id.* at 677. There was no consideration or discussion of the procedural nature of the New York law and the court's statement was purely dicta.

Similarly, in *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110 (11th Cir. 1996), the court applied the New York statute to a contract made there and sued upon in Florida, but without any discussion of the substantive-procedural distinction, noting only that New York has a "significant interest" in the application of its statute of frauds. *Id.* at 1120 n.9.

In *Arsham v. Banci*, 511 F.2d 1108 (6th Cir. 1975), the court applied the New York statute to a finder's fee oral contract made in New York but sued upon in Ohio solely on the basis that the New York statute of frauds declared the oral contract "void," with no discussion of the New York case authority discounting the meaning of that language. *Id.* at 1114 ("[I]f the statute of the state where a contract is made declares it to be "void" if not in writing, the courts of Ohio will not enforce the agreement.")[11]  In fact, the Ohio case relied upon by the court, *Detroit & Cleveland Navigation Co. v. Hade*, 140 N.E. 180 (Ohio 1922), applied a Michigan statute of frauds that Michigan's highest court had construed to make oral contracts void and not merely voidable or unenforceable. *See McGavock v.*

---

[11]  A later Sixth Circuit case applied the New York statute of frauds without discussion, solely on the basis of the *Arsham* decision. *Soviet Import Export, Inc. v. Gen. Tire Int'l Co.*, 586 F.2d 5, 5 (6th Cir. 1978).

*Ducharme*, 158 N.W. 173, 174 (Mich. 1916). In the present case, New York courts have determined that the state statute of frauds does not void the contract, regardless of the language of the statute.[12]

For these reasons, the New York statute of frauds is not applicable to bar the plaintiff's action.

### D. Quantum Meruit Claim.

Finally, the defendants contend that quantum meruit recovery is unavailable to the plaintiff because "the parties had an express, oral contract for the provision of coal consulting services." (Mem. Supp. Defs.' Mot. Summ. J. 29.) However, the plaintiff is properly seeking recovery, in the *alternative*, under the equitable theory of quantum meruit, in the event that a jury finds that there was no express

---

[12] In *Mellon v. Cessna Aircraft Co.*, Nos. 00-3023, 99-3292, 2000 WL 1208322 (10th Cir. Aug. 25, 2000) (unpublished), also cited by the defendants, a nonprecedential opinion, the court applied the New York statute of frauds to an oral contract made in New York and sued upon in Kansas, based upon the agreement of the parties and without further discussion. *Id.* at *4 n.4. The defendants also cite several cases decided by district courts sitting in diversity within this circuit that applied a foreign statute of frauds. However, two of the three decisions did not attempt to determine the appropriate statute of frauds to apply. *See O'Ryan v. Dehler Mfg. Co.,* 99 F. Supp. 2d 714, 718 n.3 (E.D. Va. 2000) ("[A]t the hearing on the instant motion, all parties agreed that Illinois law is the appropriate state law to govern the question of whether the oral agreement between the parties is valid and enforceable in light of the bar imposed by the statute of frauds."); *Pierside Terminal Operators, Inc. v. M/V Floridian*, 423 F. Supp. 962, 970-71 (E.D. Va. 1976) (concluding that the claim was barred under both the Florida and New York statutes of fraud without deciding which was determinative). Furthermore, I do not find the discussion in *Elderberry of Weber City, LLC v. Living Ctrs.-Se., Inc*., 958 F. Supp. 2d 623 (W.D. Va. 2013), to be persuasive, since it did not address the nature of the Georgia statute in determining its applicability.

agreement or that an express agreement did not address the subject matter of relevance here.

"Although little direct guidance exists as to which choice of law principles govern quasi-contractual claims in Virginia . . . courts within the Fourth Circuit generally treat quasi-contractual claim as arising out of contract." *Scott & Stringfellow, LLC v. AIG Commercial Equip. Fin., Inc.*, No. 3:10CV825-HEH, 2011 WL 1348324, at *4 (E.D. Va. Apr. 8, 2011). As such, contractual choice-of-law principles govern quasi-contractual claims. Even so, the applicable New York, Virginia, and West Virginia law all require denial of the defendants' motion for summary judgment on the plaintiffs' quantum meruit claim.

It is true that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island. R.R.*, 516 N.E.2d 190, 193 (N.Y. 1987). However, "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies." *Am. Tel. & Util. Consultants v. Beth Israel Med. Ctr.*, 763 N.Y.S.2d 466, 466 (App. Div. 2003). Likewise, under Virginia law, "where there is an express contract, but the validity of the contract is challenged, a plaintiff may plead *quantum meruit* and unjust enrichment

claims as alternative theories of liability." *Weiler v. Arrowpoint Corp.*, No. 1:10cv157, 2010 WL 1946317, at *9 (E.D. Va. May 11, 2010) (citing *Royer v. Bd. of Cnty. Supervisors of Albemarle Cnty.*, 10 S.E.2d 876 (Va. 1940)). Moreover, "[i]f an express contract exists but does not cover the services rendered, a cause of action for unjust enrichment remains available." *Lion Assocs., LLC v. Swiftships Shipbuilders, LLC*, 475 F. App'x 496, 503 (4th Cir. 2012) (unpublished). These same principles have been affirmed in West Virginia, as well. *See, e.g.*, *George Golf Design, Inc. v. Greenbrier Hotel Corp.*, No. 5:10-cv-01240, 2012 WL 4748802, at *6 (S.D.W. Va. Oct. 4, 2012) ("The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests." (alteration, internal quotation marks, and citation omitted)).

In the present case, the parties contest the existence of a finder's fee agreement. Essar admits that it hired Maggard as a consultant, but denies any contractual promise for a finder's fee — a different subject matter. Essar contends that there was merely a contract with Maggard to assist it in conducting the necessary due diligence of any acquisition, based upon his knowledge of coal mining in the region; Maggard contends that there was a different contract, one in which he would receive a commission for presenting the successful acquisition to Essar. Maggard's reliance upon this alleged agreement is challenged by Essar, and

thus he has permissibly pled an alternative quantum meruit claim. Accordingly, the defendants' request for summary judgment on the plaintiff's quantum meruit claim must also be denied.


III. CONCLUSION.

For the foregoing reasons, it is **ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 124) is DENIED.

ENTER: April 25, 2014

/s/ James P. Jones
United States District Judge